## AFFIDAVIT IN SUPPORT OF
## COMPLAINT FOR FORFEITURE

I, David A. McClelland, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Louisville Division, Owensboro Resident Agency. I have been employed as a Special Agent with the FBI for over 20 years.

2. As part of my duties as an FBI agent, I investigate criminal violations relating to mail fraud, wire fraud and money laundering. I also have participated in the execution of multiple federal seizure warrants, involving fraud and money laundering offenses.

3. This affidavit is made in support of a Complaint for Forfeiture of a 2005 Rolls Royce Phantom, four door automobile, silver in color, with a Vehicle Identification Number (VIN) of SCA1S68455UX07739. I believe there is probable cause to show that this property involved in money laundering violation of 18 U.S.C. § 1956(a)(1) and 1957, or traceable thereto, and represents proceeds traceable to mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 (both "specified unlawful activities"). Consequently, the vehicle is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

4. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of supporting a Complaint for Forfeiture, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that violations of Title 18, United States Code, Sections

Attachment A

1341, 1343, 1956, and 1957 occurred and the defendant property was involved in these violations and purchased with proceeds of these violations.

## BACKGROUND

5. Richard Maike established a business entity named Finance Ventures LLC ('hereinafter, "Finance Ventures") which was incorporated in the state of Wyoming on or about February 6, 2013, with a mailing address of 1402 Frederica Street, Owensboro, Kentucky, which is a two story red brick house with a covered front porch. The house is used by Robb Flener who runs an accounting business from this location. As described below, Flener is a participant in the fraudulent scheme in that he is receiving bank records and transferring funds from this location. Maike was living in a house located on Briarcliff Trace, Owensboro, Kentucky at the time the corporation was established.

6. On July 15, 2013, Maike also registered a business trade name, Infinity 2 Global (hereinafter I2G), in Wyoming for the Finance Ventures corporation. On September 19, 2013, Maike and Flener filed a Foreign Business Entity Certificate in the State of Kentucky for Finance Ventures to transact business in Kentucky, doing business as I2G, listing the mailing address of I2G to be 1402 Frederica Street, Owensboro, Kentucky. Maike is the President of I2G and has been promoting the business as an investment opportunity from both his home and business office located in Owensboro, Kentucky. Maike directed investors in I2G to send funds in the form of cashier's checks via mail services directly to his residence on Briarcliff Trace and established bank records with the mailing address of 1402 Frederica Street. Rob Flener is a signor with Maike on the Finance Ventures bank accounts, and signs the majority of the checks. Flener works out of the office at 1402 Frederica Street on a regular basis.

2

7. Beginning in or about March 2013, Maike induced individuals to invest in I2G by making false and fraudulent pretenses, representations, and promises, and promoted the company online in the following manner. Maike established Internet web pages with the URL's I2G.com and I2Gcasino.com. Maike used the two web sites, as well as on line conference calls and seminars, to fraudulently promote I2G to potential investors. Among other things, Maike gave investors in I2G the impression they would receive a substantial return on their investment from revenue generated through online casino gaming.

8. Based upon records reviewed to date, Maike entered into a licensing agreement on or about May 13, 2013 to use a computer application program which he relabeled I2G Touch from a company called Qubeey. Interviews of the Qubeey company president and bank records received to date indicate that Maike initially paid $5,000 on or about June 7, 2013 for this product via a $5,000 wire transfer from a Finance Ventures LLC bank account at Independence Bank in Owensboro, Kentucky to Qubeey, Inc. for "software development". Maike subsequently made additional payments to Qubeey in an attempt to add features to the I2G Touch application, and to pay for additional licensing fees. The I2G Touch application aggregates different social media products such as Facebook and Twitter onto a desktop computer. Users of the software can receive immediate "pop ups" on their screens when messages are posted to any of the user's social media accounts. The designer of the application agreed to "white label" the product so Maike could put his company name on it and tailor it to his needs. The term "white-label" is used to refer to a product or service that is produced by one company and marketed by other companies. The marketers rebrand the product to make it appear as if they made it. The term derives from the image of a white label on the packaging which can be filled in with the marketing company's trade dress. The product has some intrinsic

value but a basic version of the software was offered to the public for free through Qubeey's website.

9. Maike told potential investors that in addition to monies generated from the sale of the I2G Touch software, people who joined would be able to share in the profits of an online casino. Maike was careful to state that people in the United States could not gamble on the site. The I2G web page stated:

> We are offering a luxury experience through our
> gaming platform for our overseas markets only and an amazing
> benefits package for our US markets. With that, this platform will
> allow a wide range of individuals to create their own home based
> businesses, while having fun in our I2G social environment, online
> gaming area and use of our benefits package.

10. It appears that Maike did in fact purchase access to an online casino through a British company called Plus5Gaming. On May 15, 2013 $12,877.58 was wire transferred from the Finance Ventures bank account at Independence Bank in Owensboro, Kentucky to Plus Five Gaming LTD for "start up fee". This company advertises "white labeled" online casinos to potential users. Maike purchased their online casino product and renamed it I2Gcasino with an internet address of I2Gcasino.com. Maike claimed that actual gaming on this site could only take place from outside the United States.

11. Maike, however, falsely led potential investors to believe that I2G had a very large number of international members who would be using and promoting the casino. Maike led people to believe that if they invested in I2G, they would share in the profits of the on-line casino controlled by I2G. For example, during a conference call with I2G members on or about August 3, 2013, Maike stated that I2G "is going to be the biggest network marketing company in the world." He also stated that there is not a legitimate company that pays (investors) as much as I2G. Then, during a conference call with members on November 26, 2013, Maike stated, "each

4

month we pay according to the profits." Maike goes on to claim that the casino had a profit in August, September, and October of 2013, 50% of which was shared with I2G top level "Emperor" investors as promised on the I2G.com website. However, records received from the office of Rob Flener, as well as a review of company bank records, show that I2G did not make a profit from the online casino. Instead, I2G had to pay money to Plus 5 Gaming to keep the site running as the volume of gaming on the site was too low. Maike further fraudulently promoted the scheme by providing small returns to investors of approximately $20 a month which he claimed were casino profits, to make it falsely appear that the casino was generating some profit, lull investor's fears, and keep new investors coming into the company.

12. During a conference call on or about January 1, 2014 with I2G members, Maike stated that I2G is going to pass $300 million in sales in 2014. He also stated that I2G is going to pay out hundreds of millions of dollars a year in commissions. In reality, I2G had not received money anywhere close to this amount. In addition, money received was almost entirely from people who had sent in $5,000 investments hoping to reap the promised returns on their investment in the online casino. They were not purchasing a product and in fact could not even use the casino if they were in the United States. Therefore, monies received by I2G in this manner were not sales.

13. During a conference call with I2G members on or about February 4, 2014, Maike stated that I2G "is going to change the way gaming is done around the world." Finally, Maike claimed that I2G was in the process of purchasing a $500 million land based casino. These statements falsely left investors with the impression that the company was already reaping a significant amount of its revenue from the I2G online casino which would be returned

to investors.  To date there is no evidence that I2G has funds available to purchase or build a

casino of this magnitude or has taken any steps to do so.

14.  After making these oral representations during the conference calls (recordings of

which were reviewed by the affiant), Maike strongly encouraged people to invest in I2G at the

$5,000 level.  By investing $5,000 at the "Emperor" level in I2G, Maike told investors they

would secure a share of 50% of the casino profits earned by I2G without having to sell any

memberships into I2G.   Maike added a sense of urgency to his sales pitch by telling potential

investors that the number of investment opportunities at the Emperor level was limited to a total

of 5,000 people.   Maike also stated that in the first few months of the program, three people had

made over $200,000, thereby enticing people to invest and to further promote I2G.  Investors

were directed via the I2G.com web page to mail their $5,000 payments in the form of cashier's

checks or money orders to the I2G "Global Headquarters" on Briarcliff Trace, Owensboro,

Kentucky, which is in fact Maike's personal residence.   Based on Maike's representations and

promises about investment in I2G, Maike received over $16 million in investor funds from the

company's inception in February 2013 through and September 30, 2014.  This includes

approximately $3.8 million deposited into the company's account in Hong Kong, the contents of

which were not available in your affiant's initial review of funds received.

15.  Other I2G investors began to promote the company at a feverish pace, not only to

collect what they believed were to be large casino profits, but also to collect commissions for

signing up new members.  By September 2014, Maike had deposited over $12 million into I2G

bank accounts he opened at various financial institutions located in Kentucky.  Virtually all of

these funds were comprised of monies received from individual investors and mailed to Maike at

his home address. Several of the financial institutions where Maike established an I2G account quickly closed the account due to the ties the company maintained it had to online casino betting.

16.  On January 22, 2014, Maike created another business entity called Tech Entertainment, LLC, and filed in Wyoming. Maike registered Tech Entertainment in Kentucky as a foreign business entity on May 15, 2014, with a street and mailing address at Flener Tax and Accounting, 1402 Frederica Street, Owensboro, Kentucky. Within the week, on May 18, 2014, Maike opened a bank account in the name of Tech Entertainment at BB&T Bank, and continued to deposit investor proceeds made payable to I2G or Infinity 2 Global into the Tech Entertainment bank account through May and June, 2014.   On June 16, 2014, Maike filed with the Kentucky Secretary of State's Office withdrawing the business name Infinity 2 Global. He registered Global 1 Entertainment as a business trade name for Tech Entertainment, LLC on July 22, 2014, in Wyoming.   On or about July 30, 2014, Maike made an announcement via a conference call to the I2G members that the company was being "rebranded" as Global 1 Entertainment. He instructed the members not to give the impression when promoting the company that it was in the business of online gambling. Maike then shut down the I2G and the I2Gcasino web pages, leaving no forwarding link from either of these pages to the new company web page. From this time on, Maike continued to have monthly conference calls with I2G member investors, but never mentioned the online casino or the brick and mortar casino Maike had represented that I2G was in the process of purchasing. Instead, Maike began pitching products such as travel packages and the opportunity for members to participate in a fantasy football league.

## TRACING FUNDS RECEIVED

17. Maike initially established bank accounts at various local financial institutions in the name of Finance Ventures, dba Infinity 2 Global. Most of these financial institutions shut down Maike's I2G account after seeing the large volume of suspicious activity in the account. As noted above, Maike received over $16 million in investor funds from the inception of the company in February 2013 through September 30, 2014.

18. Approximately $8 million (50%) of this money was paid out to promoters of I2G as commissions. Approximately $4 million (25%) of this money was transferred to Maike in the form of credit card payments, transfers to other accounts controlled by Maike, withdrawn in cash, or used to purchase land. The remaining funds were used to pay refunds, and other third party commissions.

19. Maike used approximately $3 million of the I2G investor funds to purchase two parcels of land in Kansas. He purchased the first parcel by transferring the funds to several accounts in the following manner. On November 20, 2013, Maike wire transferred $965,000 from the I2G bank account at PNC bank to the I2G account with HSBC Hong Kong. Five days later, on November 25, 2013, Maike transferred the $965,000 from I2G's HSBC account in Hong Kong to a personal account at JP Morgan Chase in the name of his wife, Angela Leonard. The next day, on November 26, 2013, $964,000 was transferred from Angela Leonard's account with JPMorgan Chase to a land title company in Manhattan, Kansas. The multiple transfers of the money in just a few days has no other purpose other than to conceal the nature, source location, ownership or control of the funds. These funds were used to close on the first parcel of land on November 27, 2013 at a sales price of $962,000.

8

20. Maike funded the purchase of the second parcel in the following manner. On November 14, 2013, Maike incorporated RAW Ventures LLC in the State of Kansas. On December 30, 2013, Maike and Leonard opened a bank account at ESB Financial in Manhattan, Kansas in the name of RAW Ventures LLC. At the same time, Maike rented a safety deposit box at the bank. Between February 27, 2014 and April 30, 2014, Maike made a series of wire transfers from his Finance Ventures bank accounts containing I2G investor funds at Chase Bank to the HSBC Hong Kong account and then into the newly created RAW Ventures account. Then, during the month of April 2014, Maike caused $2,292,971 to be transferred from the RAW Ventures bank account to the title company. Then on April 30, 2014, Maike transferred $85,000 from a Finance Ventures account at 5th 3rd Bank directly to the title company. In addition, bank records show Maike accessed the safety deposit box he rented at ESB Financial in late December 2013, on two separate occasions - 2/24/2014 and again on 4/30/2014. On 4/30/2014, Maike deposited $420,000 in United States currency into the RAW Ventures bank account at ESB Financial and then wire transferred these funds to the title company. He then closed on the purchase of the land on 4/30/2014 for the purchase price of $2,368,000. Maike commented to the title company agent at closing that he has relatives in the Riley County area and he may put a home on the property in the future.

21. During the search of his residence in January of 2015, the affiant asked about the source of the $420,000 in cash he used to purchase the Kansas land. Maike stated that the cash came from the sale of I2G t-shirts and promotional items from I2G conventions. Based upon the evidence reviewed thus far, no such sales have been verified and it is highly unlikely that the cash represents anything but proceeds from investor payments either made initially in cash, or converted to cash by Maike.

22. Several checks were cashed from the JP Morgan Chase Bank account in the name of Finance Ventures in a manner to conceal the cash transaction reporting requirements. For example the following checks were written by Maike or Rob Flener to cash from the JP Morgan Chase account:

| Date | check# | Amount |
|------|--------|--------|
| 11/15/2013 | 1002 | $9,500 |
| 11/21/2013 | 1003 | $9,500 |
| 11/22/2013 | 1004 | $4,500 |
| 11/22/2013 | 1005 | $5,000 |
| 1/9/2014 | 1055 | $9,500 |
| 1/10/2014 | 1058 | $9,500 |
| 1/13/2014 | 1060 | $5,500 |
| 1/24/2014 | 1076 | $9,500 |
| 1/30/2014 | 1081 | $9,000 |
| 1/31/2014 | 1082 | $9,000 |
| 2/4/2014 | 1087 | $9,500 |
| 2/19/2014 | 1122 | $8,500 |

23. A review of bank account records shows that on or about April 1, 2014, Maike purchased a large "record safe" for $5,965 from a business located in Evansville, Indiana, approximately one hour from Maike's residence. On January 15, 2015, your affiant seized approximately $150,000 from a locked safe at Maike's residence pursuant to a search warrant. It appears that Maike again diverted money from Finance Ventures and placed the funds in a personal safe.

## WITNESS STATEMENTS

24. Your affiant has spoken to several individuals who were enticed to send money to I2G based on representations made by Maike and other promoters of the scheme. One such individual, hereafter referred to as M.H., invested $5,000 with I2G in February 2014. M.H. lives alone and is approximately 64 years of age. She initially invested approximately $600 in the company with her credit card through the company website. She was later convinced by one of the I2G promoters to increase her investment to $5,000 so that she could immediately start sharing in the alleged casino profits. M.H. sent a check to the residence at Briarcliff Trace, Owensboro, Kentucky for $4,400. M.H. was left with the impression that legalized on line gambling was imminent in the United States, and she would be able to earn much more than her initial $5,000 investment in a very short period of time. However, M.H. only received about a 10 to 15 dollar credit each month after her investment. M.H. sent several e-mails to David Koerner who is listed as the I2G attorney, asking for a statement to quantify the alleged casino profits she was receiving, but she never got a reply. After threatening to report I2G to law enforcement, M.H. received a check from Tech Entertainment LLC, with the residence's address on Briarcliff Trace, Owensboro, Kentucky, for $4,400.

25. Another individual, hereafter referred to as D.R. invested in I2G after reading claims made about I2G by other investors on Facebook and in online chat rooms. In May 2014, D.R. wire transferred $5,019.95 to the I2G bank account in Hong Kong based on the promises of making a high return on his investment from the company's online casino. D.R. became suspicious of the legitimacy of I2G in October 2014 after he realized the total return on his investment for the preceding five months was approximately $100, far less than he had been led to believe he would receive from his I2G investment. D.R. also was concerned that the company

11

name had changed abruptly, and all Maike's online or telephonic discussions with investors about online gambling as the focus of the company's business model had also ceased abruptly. D.R. hired an attorney to request a refund and subsequently received a letter dated November 12, 2014, from David Koerner, I2G's attorney, that no refund would be issued. In the letter, Koerner denies that any misrepresentations were made and makes an argument that the money D.R. sent to I2G was not an investment but a purchase. Koerner states D.R. "simply purchased a product, received full use of that product, and still does today." This appears to be another misrepresentation as it is unlikely a person would purchase access to an online gaming site that they could not use for $5,000.

26. Your affiant has spoken to several other individuals with similar accounts of their dealings with I2G. Many of these investors purchased multiple Emperor positions for $5,000 each, convinced that the multiple positions would reap large returns from the on-line casino. In some cases, individual investors lost over $100,000 each.

### PURCHASE OF ROLLS ROYCE VEHICLE

27. Several individuals promoted I2G and sold the $5,000 Emperor positions as described above. These promoters received commissions for these sales. One such promoter was Dennis Dvorin. A review of Dvorin's bank records (for his account at The University Credit Union), received to date, show the following deposits into his account:

| | | |
|---|---|---|
| 11/19/2013 | Cash | $ 21,500.00 |
| 11/22/2013 | Wire from I2G Chase Account | $74,862.47 |
| 12/30/2013 | Cash | $35,000.00 |
| 12/30/2013 | Wire from I2G Chase Account | $69,000.00 |
| | | $200,362.47 |

This account maintained an average balance of approximately $2,000 from January 1, 2013 until the above deposits were made. Based upon bank records, Dvorin received additional commission payments from I2G of $426,448 in 2014.

28. A further review of Dvorin's bank records show that on or about 12/31/2013, Dvorin wire transferred $136,099 from this bank account to Automotive Management Services, Inc., an automobile dealership, for the purchase of a 2005 Rolls Royce Phantom, four door automobile, silver in color, with a Vehicle Identification Number (VIN) of SCA1S68455UX07739. The automobile dealership records show Dvorin to be the purchaser of the vehicle, and the vehicle was shipped to JJ Conway, in San Pedro, California.

29. On June 5, 2015 your affiant spoke to James "JJ" Conway. Conway stated that Conway had been paid by Dvorin to provide Dvorin with consulting advice as to how to avoid paying tax on his recent income from I2G. Dvorin wrote Conway a check for $60,000 on 12/26/2013 for "consultant fee" (which your affiant confirmed with copy of check from Dvorin's bank account). Conway suggested that Dvorin buy the Rolls Royce as a tax write off. Conway went on to explain that Dvorin drove the car maybe once, and the car was essentially a "prop" for potential I2G investors to see, and to entice them to invest in I2G and hopefully make money like Dvorin. In this way, the car was used to promote the fraudulent scheme. According to Conway, Dvorin was bankrupt and divorced and appeared to be a "failure". By placing Dvorin at the top of the I2G pyramid commission structure, Dvorin received large commissions from I2G and was a like a magnet drawing attention from would be I2G investors who saw Dvorin appear to go from rags to riches. In reality, Dvorin only sold a handful of Emperor positions for I2G, but he received large commissions for all of the sales made by members under him in the I2G pyramid.

13

30. In addition to providing tax advice to Dvorin, Conway was paid by Maike to provide sales training seminars to I2G members. A review of I2G's bank records shows a wire transfer of $70,000 from an I2G account to JJ Conway on April 22, 2014. Conway acknowledged that he provided sales seminars to I2G members in Las Vegas.

31. A review of Conway's criminal history report shows that Conway was arrested for federal tax evasion in 2000 and later sentenced to 13 months incarceration and 3 years of supervised release. In addition, Conway was named in a civil lawsuit filed by the Securities and Exchange Commission (SEC) in 2005 in which it was alleged that he participated in a fraudulent investment scheme which defrauded 70 investors of over $7 million. Conway's partner in this scheme, Frederick Celani, who used an alias of Sidney Levine, was arrested for his participation in this scheme on or about 3/16/2009, after being a fugitive since September 26, 2005. Celani later plead guilty to mail fraud and money laundering charges in the Eastern District of New York on March 21, 2013. To date, Conway has not been charged criminally for his part of this scheme, and the conclusion of the civil complaint is unknown.

32. Conway stated that Dvorin stills owes him approximately $35,000 for "financial consulting" services he has provided to Dvorin. Because of this debt, Conway has filed a lien on the vehicle, and has the vehicle at his (Conway's) residence in San Pedro, California.

33. A review of California Department of Motor Vehicle records as of June 5, 2015 show the vehicle described above to be registered to Dennis Dvorin with JJ Conway listed as a lien holder.

34.     On or about May 2014, Dvorin created a promotional video titled "How I2G Millionaire Dennis Dvorin Made his Money", which was posted on the internet. In this video Dvorin makes statements about I2G. In the first part of the video, Dvorin is filmed driving the

14

above mentioned Rolls Royce vehicle. Dvorin explains, while sitting in the vehicle, he was able to purchase the vehicle from the proceeds he made from I2G. Dvorin tells viewers that they should tell potential investors in I2G that, "you make money every time someone places a bet." He goes on to encourage people to buy the $5,000 Emperor package by stating that as an Emperor , "you share in the pool of the profits of the casino for life." Dvorin goes on to say that, "75% of profits from the casino are shared with the field. That makes it very lucrative." Finally, Dvorin states, "I finished the first six months (with I2G) making over seven figures."

35.    Your affiant's review of I2G bank records and Dvorin's bank account show that he was paid approximately $626,810 in I2G commissions from the inception of I2G through September 2014. This includes $56,500 in currency deposits into Dvorin's account, the origin of which is not known. However, even including this cash, the bank records indicate that Dvorin did not make over $1 million as he represented in his promotional video. In addition, money he received was generated from signing up other investors, and not from casino profits. As noted above, records indicate the casino never generated a profit, and Dvorin's statements about the casino profits falsely promote I2G to potential investors.

35. A federal seizure warrant for the above noted vehicle was obtained on June 11, 2015, and on or about June 18, 2015, FBI Agents seized the vehicle from Conway's residence located in San Pedro, California. As set forth in the Complaint, the FBI began administrative forfeiture proceedings and Dvorin filed the only claim to the vehicle.

15

## CONCLUSION

36. Based on the above information, there is probable cause to believe that a scheme to defraud, and financial transactions in violation of Title 18, United States Code, Sections 1341, 1343, and 1956(a)(1) and 1957 have occurred, and that the Rolls Royce vehicle represents property involved in money laundering (or traceable thereto) and was obtained and purchased with proceeds traceable to mail and wire fraud.

37. Based on the foregoing, your Affiant believes there is probable cause to show that this property was involved in money laundering in violation of 18 U.S.C. §§ 1956(a)(1) and 1957, or traceable thereto, and represents proceeds traceable to mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. Consequently, the vehicle is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

*Signature on Next Page*

FURTHER AFFIANT SAYETH NOT.

David A. McClelland
Special Agent
Federal Bureau of Investigation